# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROGER S. GARDNER,         :
                         :
        Plaintiff     :    CIVIL NO. 3:12-CV-193
                         :
    vs.             :    (Judge Conaboy)
                         :
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL    :
SECURITY,             :
                         :
        Defendant     :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Roger S. Gardner's claim for social security disability insurance benefits.

On May 22, 2008, Gardner protectively filed[1] an application for disability insurance benefits. Tr. 19, 94 and 117-127.[2] The application was initially denied by the Bureau of Disability Determination[3] on September 29, 2008. Tr. 19 and 95-

_____

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on April 23, 2012.

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security

(continued...)

98.  On October 21, 2008, Gardner requested a hearing before an administrative law judge. Tr. 19 and 101-102.  After 15 months had passed, a hearing was held on January 14, 2010. Tr. 19 and 32-74. On February 23, 2010, the administrative law judge issued a decision denying Gardner's application. Tr. 19-27.  As will be explained in more detail *infra*, the administrative law judge found that Gardner could engage in a limited range of light work. Tr. 22-23. On March 22, 2010, Gardner requested that the Appeals Council review the administrative law judge's decision. Tr. 115-116.  After 20 months had passed, the Appeals Council on November 25, 2011, concluded that there was no basis upon which to grant Gardner's request for review. Tr. 1-6.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Gardner then filed a complaint in this court on January 31, 2012.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 16, 2012, when Gardner elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.

_____

3.  (...continued)
Administration.  Tr. 95.

4.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Gardner meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 19, 21 and 127.

Gardner, who was born in the United States on May 8, 1958, graduated from high school in 1976. Tr. 38, 119,and 126-127. Gardner can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 45, 143, 148 and 153. During his elementary and secondary schooling Gardner attended regular education classes. Tr. 148. After graduating from high school, Gardner did not obtain any other training. Id. Gardner is right-handed. Tr. 39. Gardner is 6 feet tall and weighs 171 pounds, which places him in the category of normal weight.[5] Id.

Gardner has past relevant employment[6] as a "laborer machine operator" which was described as semi-skilled, medium work

---

5. Gardner's Body Mass Index (BMI) is 23.2. Adult BMI Calculator, Centers for Disease Control and Prevention, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed March 18, 2013).

6. Past relevant employment in the present case means work performed by Gardner during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

by a vocational expert.[7] Tr. 62.  In documents filed with the

Social Security Administration Gardner stated that he worked as a

---

7.  The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

>    (a) *Sedentary work*. Sedentary work involves lifting no
>    more than 10 pounds at a time and occasionally lifting
>    or carrying articles like docket files, ledgers, and
>    small tools.  Although a sedentary job is defined as
>    one which involves sitting, a certain amount of walking
>    and standing is often necessary in carrying out job
>    duties.  Jobs are sedentary if walking and standing are
>    required occasionally and other sedentary criteria are
>    met.
>
>    (b) *Light work*.  Light work involves lifting no more
>    than 20 pounds at a time with frequent lifting or
>    carrying of objects weighing up to 10 pounds.  Even
>    though the weight lifted may be very little, a job is
>    in this category when it requires a good deal of
>    walking or standing, or when it involves sitting most
>    of the time with some pushing and pulling of arm or leg
>    controls.  To be considered capable of performing a
>    full or wide range of light work, you must have the
>    ability to do substantially all of these activities.
>    If someone can do light work, we determine that he or
>    she can also do sedentary work, unless there are
>    additional limiting factors such as loss of fine
>    dexterity or inability to sit for long periods of time.
>
>    (c) *Medium work*.  Medium work involves lifting no more
>    than 50 pounds at a time with frequent lifting or
>    carrying of objects weighing up to 25 pounds.  If
>    someone can do medium work, we determine that he or she
>    can do sedentary and light work.
>
>    (d) *Heavy work*.  Heavy work involves lifting no more
>    than 100 pounds at a time with frequent lifting or
>    carrying of objects weighing up to 50 pounds. If
>    someone can do heavy work, we determine that he or she
>    can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

"laborer" for a "[r]efining plate manufactorer" (sic) from June 28, 1976 to May 14, 2008. Tr. 145.  Gardner described the position as a "[m]achine operator and inspector." Id.  He stated that during an 8-hour workday he would walk 4 hours and stand 8 hours. Id.  With regard to the amounts and items lifted and carried, Gardner stated that he lifted and carried metal plates to and from machines, the heaviest items he lifted weighed 50 pounds and he frequently lifted items weighing 25 pounds. Id.

Records of the Social Security Administration reveal that Gardner had reported earnings in the years 1976 through 2008. Tr. 139.  Gardner's highest annual earnings were in 2002 ($34,929.79) and his lowest in 1976 ($2869.60). Id.  Gardner's total earnings during those 33 years were $791,679.52. Id. Gardner stopped working on May 14, 2008. Tr. 144.

For the reasons set forth below we will affirm the decision of the Commissioner denying Gardner disability insurance benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the

Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

7

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits. <u>See</u> 20 C.F.R. §404.1520; <u>Poulos</u>, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments

---

8. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

9. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is

(continued...)

8

that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A

---

9.  (...continued)
a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

11.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS AND OTHER EVIDENCE**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Gardner's medical records.  We will commence with records from April to September, 2004, which predate Gardner's alleged disability onset date of May 14, 2008.  It appears that Gardner contends that these records reveal at least a partial impetus for his present medical condition and his alleged inability to work. See Doc. 11, Plaintiff's Brief, p. 2.

On April 23, 2004, Gardner "fell [] on some stairs and landed directly on his [left] forearm." Tr. 197.  On April 24, 2004, Gardner was initially treated at the Muncy Valley Hospital, Muncy, Pennsylvania. Tr. 187-195.  An x-ray performed at that hospital revealed a "[m]ildly comminuted and displaced fracture of the mid to distal ulnar shaft." Tr. 196.  A splint was applied to Gardner's left lower arm, he was prescribed pain medications and

discharged from the hospital with instructions to follow-up with his primary care physician. Tr. 192-194.

A physical examination performed on April 27, 2004, by John H. Bailey, M.D., his primary care physician, revealed the following: "There is obvious crepitus over the ulnar aspect of the forearm. He has 2 lacerations, both of which appear relatively superficial. No significant bleeding from either site. No drainage present. Neurological status is intact distally. He does have some swelling of the hand. There is no tenderness at the elbow or wrist." Tr. 197. Dr. Bailey's impression was that Gardner suffered from a "[Left] isolated ulnar [fracture]" and stated in his report of the appointment that "these fractures tend to heal with conservative treatment but do occasionally require prolonged conservative treatment." Id. Dr. Bailey placed Gardner in a long arm case and scheduled a follow-up appointment in 3 weeks. Id. It was stated that Gardner would be left in the cast for 6 weeks followed by "short-arm casting." Id.

On May 18, 2004, Gardner had an appointment with Dr. Bailey who found that Gardner was "doing relatively well" and was having "no problems." Tr. 198. Gardner's cast was "fitting nicely" and his neurovascular status was intact. Id. An x-ray revealed "[s]ome evidence of new bone formation." Id. A follow-up appointment was scheduled in one month. Id.

At an appointment on June 24, 2004, Dr. Bailey removed the cast from Gardner's arm. Tr. 199. After removing the cast, an examination revealed "minimal tenderness at the [fracture] site." Id. Gardner was directed to work on his range of motion of the elbow. Id. An x-ray of the same date revealed a "[h]ealing fracture, left ulna, in anatomic alignment." Tr. 203. A physical examination of Gardner by Dr. Bailey on July 8, 2004, revealed a healing fracture and left elbow effusion (swelling) "most likely secondary to immobilization in the cast." Tr. 200. An x-ray of the left elbow revealed "[j]oint effusion" but "[n]o acute bony deformity[.]" Tr. 201. Gardner was referred to physical therapy which he attended from July 13 to September 3, 2004, when he was discharged from the program. Tr. 200 and 204-216. Gardner did not seek further treatment for his arm and the record reveals that he returned to work. Tr. 139 and 145.[12]

The next medical record that we encounter is from June 12, 2007. Tr. 217-224. On that date, Gardner visited the emergency department of the Muncy Valley Hospital complaining of right knee pain. Id. An x-ray revealed no soft tissue swelling and no evidence of a fracture. Tr. 219. Gardner was discharged

---

12. In 2004 Gardner's total earnings were $31,951.08, in 2005 $32,902.09, in 2006 $34,302.49, in 2007 $32,064.44 and in 2008 $16,757.27. As stated earlier, Gardner stopped working on May 14, 2008.

from the hospital and he did not seek further medical attention for his knee. Tr. 224. Gardner continued to work. Tr. 139 and 145.

On August 2, 2007, Gardner was found "laying prone" along the side of the road at the 1600 Block, John Brady Drive, Muncy Creek Township by Pennsylvania State Police. Tr. 247. The report of this incident states in part as follows: "Appears he fell [and] struck his face [and] with his glasses on the edge of [the] pavement. We only notice blood on his face where [] he was laying and he appears to have been incontinent of urine. There was a cold 'pounder' of beer in his pocket [and] a strong odor of an ETOH beverage on his breath. No signs of any broken car parts in the area . . . did not know where he was or what had happened . . . . Noted edema to the [left] side of his face with eye swollen shut, lacerations noted to his mouth [and] small cuts on his hands . . . Manual c spine taken right away, no obvious trauma, grimace or pain upon [palpation] to back of head, cervical, thoracic, lumbar, sacral, coccyx spine, no fluid from ears, nose or mouth with the exception of blood from laceration to his lip. No Trauma or pain upon palp[atation] to trunk, back, noted some scrap on his upper extremities." Id. Gardner was taken to the emergency department at Muncy Valley Hospital where he received initial treatment. Tr. 237-244. He was then transferred to the

Williamsport Hospital because of the "need for neurosurgical specialist care not available at [Muncy Valley Hospital]." Tr. 245.

Blood work revealed that his blood alcohol level was over 4 times the legal limit (320 mg/dL or .320 g/dL). Tr. 228. While at Muncy Valley Hospital Gardner was uncooperative but when he was transferred to the Williamsport Hospital he was in a stable condition. Tr. 243. A CT scan of the face revealed a "[l]eft orbital floor fracture with depression of fragments into the sinus" and a "deviated nasal septum to the left." Tr. 232. A CT scan of the head revealed a "[p]ost-traumatic bilateral subarachnoid hemorrhage[13] within the bilateral sylvian fissure and the bilateral frontal convexity sulcus." Tr. 231. X-rays of the cervical spine revealed "no evidence of any acute fracture" but "osteoarthritic changes." Tr. 235. After his discharge from the hospital, Gardner again returned to work. Tr. 139 and 145. There is no indication in the record that Gardner received additional treatment for the conditions identified in the CT scans of the head and face.

---

13. "Subarachnoid hemorrhage is bleeding in the area between the brain and the thin tissues that cover the brain. This area is called the subarachnoid space." Subarachnoid hemorrhage, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001720/ (Last accessed March 19, 2013).

In May 2008, Gardner's employment was terminated because of poor performance. Tr. 144. Gardner then simultaneously applied for unemployment compensation benefits and disability insurance benefits.

On September 16, 2008, Gardner was examined by R. Craig Nielsen, M.D., on behalf of the Bureau of Disability Determination. Tr. 249-258. During that examination, Gardner complained of problems with his left arm. Tr. 249. Dr. Nielsen diagnosed Gardner as suffering from (1) alcoholism active with no desire to stop drinking; (2) hypertension, presently not treated, probably essential; (3) left arm weak flexion and inability to actively abduct the left shoulder, probably neurologic damage from old fall injury; and (4) chronic obstructive pulmonary disease (COPD).[14] Tr. 252. Dr. Nielsen after conducting an interview and physical examination which was essentially normal (other than revealing high blood pressure, signs of COPD and obvious weakness of the left upper extremity) concluded that Gardner could engage in a limited range of light work. Tr. 253-254. Dr. Nielsen did find that Gardner's lifting/carrying ability of the left arm was limited to 2 to 3 pounds.[15]

---

14. Gardner told Dr. Nielsen he smokes 1 to 1 ½ packs of cigarettes per day and that he has no desire to quit. Tr. 250.

15. Gardner testified that he could only lift 50 pound to waste
                                        (continued...)

On September 25, 2008, Mary Ryczak, M.D., reviewed Gardner's medical records on behalf of the Bureau of Disability and determined that Gardner could engage in a limited range of light work. Tr. 259-265. She found that Gardner had the ability to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. Dr. Ryczak did find that Gardner was limited with respect to pushing and/or pulling with the left upper extremity and reaching in all directions, and that he could not climb ladders, ropes, scaffolds, and could only occasionally crawl. Tr. 260-261.

On September 17, 2009, Gardner had an appointment with Steven Yordy, M.D., apparently to establish a treatment relationship. Tr. 284-285. At this appointment Gardner's high blood pressure and problem with his left upper extremity were addressed. Id. When Dr. Yordy reviewed Gardner's systems,[16] Gardner denied fatigue, fever, night sweats, cough, dyspnea, wheezing, chest pain, irregular heartbeat or palpitations,

---

15. (...continued)
level with his left arm but that he could lift and carry up to 40 pounds with his right arm. Tr. 51.

16. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed March 18, 2013).

abdominal pain, constipation, diarrhea, vomiting, dysuria, and hematuria. Tr. 284. The results of a physical examination were normal except for high blood pressure at 140/100 and positive pain in the left shoulder with active/passive range of motion. Tr. 284-285. Gardner was unable to abduct the left shoulder. Id. Dr. Yordy noted that Gardner's extremities appeared normal. Tr. 285. Dr. Yordy's assessment was that Gardner suffered from adhesive capsulitis of the left shoulder, benign hypertension, a history of alcoholism and tobacco abuse. Id. Dr. Yordy prescribed the drug atenolol for Yordy's high blood pressure and ordered an MRI of left shoulder. Id. The MRI was performed on December 3, 2009, and revealed (1) a moderate degree of skeletal muscle atrophy about the shoulder, (2) extensive soft tissue edema (swelling), (3) no discernable rotator cuff or biceps tendon tears, and (4) degenerative arthritis of the acromioclavicular joint. Tr. 286.

On December 17, 2009, Gardner had an appointment with Ronald E. Disimone, M.D., regarding "lack of use of his [left] shoulder and arm." Tr. 296-297. Gardner told Dr. Disimone that the "[p]roblem has been happening since approximately 5 y[ears] ago when he had a broken arm" and "has bothered him since then and he's chosen not to have any treatment up to this point." Tr. 296. Gardner also told Dr. Disimone that he drinks alcohol daily and smokes 1 ½ packs of cigarettes per day and that his hobbies

include fishing and hunting.  Id.   A physical examination revealed elevated blood pressure, extreme left arm weakness, virtually no grip strength in the left hand, and decreased range of motion and strength of the left upper extremity.  Id.  However, Gardner's neck and back were non-tender and he had no motor or sensory deficits. Id.  After reviewing Gardner's recent MRI of the left shoulder, Dr. Disimone's impression was as follows: "Healed [left] forearm fracture, deltoid weakness." Tr. 297.  Dr. Disimone recommended that Gardner have an electromyography (EMG) of the left upper extremity to rule out any nerve damage.  Id.

The EMG was performed on December 23, 2009.  The report of the EMG stated in part as follows:

> This is an abnormal study. There is electrodiagnostic evidence of a severe left C5 radiculopathy affecting all of the C5 innervated tested muscles.  Of significance is that the left rhomboids, which are innervated directly from the C5 spinal root and has no cross innervation from any other level, has signs of severe denervation.  The presence of chronic repetitive discharges and myotonic discharges on his biceps are evidence that this is a chronic radiculopathy.

Tr. 287-288.  The C5 tested muscles were the biceps brachii, deltoid, supraspinatus, rhomboids, and upper cervical paraspinals. Tr. 290.  These muscles are involved in the flexion, adduction, abduction and rotation of the shoulder, the abduction of the arm, the flexing of the elbow, the supination of the forearm and the

stability of the spine.[17] The report further indicated that there was some evidence of very limited reinnervation and that there was no guarantee that a "decompresion laminectomy" would result in "full reinnervation and strength on these muscles." Tr. 288. The report noted that Gardner had a "poor prognosis" but also the need for "[c]linical correlation." Tr. 280.

On December 29, 2009, Gardner had an appointment with Dr. Disimone and complained about "upper extremity weakness" but Gardner stated that he did not "have any pain or any discomfort in his neck." Tr. 291. Dr. Disimone's impression was chronic cervical radiculopathy and left upper extremity weakness "status post [left] forearm fracture, healed." Id. Dr. Disimone ordered an MRI of the cervical spine. Id. That MRI which was performed on January 4, 2010, revealed "[m]ultilevel spinal stenosis . . . associated with spondylosis as well as malalignment" and "significant neural foraminal compromise seen at multiple levels secondary to osteophyte formation." Tr. 292. No disc herniations were seen. Id.

On January 11, 2010, Gardner had an appointment with Dr. Disimone to review the results of the MRI. Tr. 298. It was

17. Flexion is movement resulting in the reduction of a joint angle; adduction is movement toward or beyond the midline of the body in the frontal plane; abduction is movement of a body part away from the midline of the body; and supination is rotation laterally.

observed that Gardner continued to have left upper extremity weakness which was "unchanged since his first visit." Id.  Gardner was referred to another physician for further treatment of his cervical condition and instructed to follow-up with Dr. Disimone as needed. Id.

After the administrative law judge decision on February 23, 2010, Gardner submitted to the Appeals Council a letter from Dr. Yordy which states in toto as follows:

> Mr. Roger Gardner clearly in my mind would be classified as disabled due to his medical condition. I see little chance he could ever work in any labor-type job.  He does have cervical spinal stenosis with damage to the C5 nerve which renders the left arm pretty much useless. He suffers from left arm/shoulder muscle atrophy and weakness.  He has not seen a neurosurgeon for an opinion on this though it appears from the EMG results some of this damage is permanent.

Tr. 302.  Dr. Yordy did not provide a detailed functional assessment of Gardner's ability to lift, carry, stand, walk, sit, push, pull, and perform postural activities such as bending, stooping and crouching.  The only detailed assessments in the record are from Dr. Nielsen and Dr. Ryczak who concluded that Gardner could engage in a limited range of light work.

Although Gardner claims that he became disabled on May 14, 2008, because of a inability to lift heavy objects and use his left upper extremity and the associated pain, records of the Social Security Administration reveal that during the 2nd quarter

of 2008 he received $1970.00 in unemployment compensation, during the 3rd quarter of 2008 he received $7130.00, during the 4th quarter of 2008 he received $5408.00, during the 1st quarter of 2009 he received $4992.00 and during the 2nd quarter of 2009 he received $416. Tr. 132-133. At the administrative hearing on January 14, 2010, Gardner testified that he was still receiving unemployment compensation benefits. Tr. 39-40.[18]

---

18. Gardner contends that the ALJ used his receipt of unemployment compensation as one reason to find that he was not disabled. Gardner argues this was error. We find no merit to this argument. It is clear from a review of the ALJ's decision he considered Gardner's receipt of unemployment benefits in permissible manner, i.e., to judge Gardner's credibility.

An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). The Pennsylvania Department of Labor and Industry's website indicates the following: "UC is for people who lost a job because of something that wasn't their fault. If you're out of work because your employer had to make cutbacks, close an office, went out of business or something you couldn't control, it's possible that you will be eligible to collect UC. If your out of work because you quit, you might not be eligible for UC. If you were fired from your company, you might not be able to collect UC. Finally, you must be able and ready to return to work(either to your old job or a new one) to claim UC."

The Pennsylvania Department of Labor and Industry further published a handbook which indicates that to be eligible for UC a claimant must file timely biweekly claims for the weeks that the claimant is unemployed. The handbook further indicated that a claimant is ineligible if the claimant limits the number of hours he or she works when there is additional work available. Pennsylvania Unemployment Compensation Handbook, Pennsylvania Department of Labor & Industry, Office of Unemployment Compensation Benefits, http://www.lancasterlibraries.org/lslc/lib/lslc/biz_pdfs/pennsylvania_unemployment_compensation_handbook.pdf (Last accessed March 18, 2013).

The fact that Gardner collected unemployment

(continued...)

In a document filed with the Social Security Administration entitled "Function Report - Adult" Gardner stated that he lived in an apartment by himself. Tr. 159. Gardner admitted that he had no difficulty attending to his personal care, including dressing, bathing, shaving and feeding himself. Tr. 151. Gardner reported that he did not require reminders to take care of personal needs and grooming or reminders to take his medications. Tr. 152. Gardner is able to prepare simple meals and perform household chores such as laundry, cleaning, repairs and mowing. Id. Gardner needs no encouragement to engage in these activities. Id. Gardner goes out every day. Tr. 153. Gardner is able to walk and drive a car. Id. He shops in stores for clothes and food one or two times per week "usualy (sic) ½ to 1 ½ hours per trip."

_____

18. (...continued)
compensation after his alleged disability onset date of May 14, 2008, suggests that he represented when applying for such benefits that he was able and willing to accept employment. In fact Gardner testified that he so represented. Tr. 40-41. Also, those who have an application for unemployment compensation approved are required to file a claim biweekly for benefits. Pennsylvania Unemployment Compensation Handbook, Pennsylvania Department of Labor & Industry, Office of Unemployment Compensation Benefits, http://www.lancasterlibraries.org/lslc/lib/lslc/biz_pdfs/ pennsylvania_unemployment_compensation_handbook.pdf (Last accessed March 18, 2013). Furthermore, Gardner, in a document filed with the Social Security Administration on July 22, 2008, was asked what he did from the time he wakes up in the morning until he goes to bed. Tr. 150. He answered that question by stating "Look for a job." Id. The same month Gardner applied for disability insurance benefits he applied for and received unemployment compensation. This inconsistent conduct clearly was a factor that the ALJ could consider when judging Gardner's credibility.

Gardner is able to pay bills, count change, handle a savings account and use a checkbook/money orders. Id.

Gardner stated that he engages in fishing, hunting and visiting with family and that he engages in these activities "whenever [he] can." Tr. 154. When asked to describe any changes in these activities, he stated "[n]ot a lot of change." Id. He reported that "on a regular basis" he goes to "sporting events, concerts, fishing" but not "often." Id. When asked to "[c]heck any . . . items" on a list that his "illnesses, injuries of conditions affect" Gardner did not check squatting, bending, standing, walking, sitting, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions and getting along with others. Tr. 155. He reported that he could walk 2 miles before he had to rest and that he finishes what he starts. Id. In a form entitled "Disability Report – Appeal" dated October 21, 2008, Gardner when asked whether there had been any change in his condition since the last report was completed stated "No." Tr. 164-167.

At the administrative hearing held on January 14, 2010, Gardner downplayed his abilities and deviated from his answers set forth in the "Function Report - Adult." Tr. 43-59. He stated that he "used to love to hunt and fish" but that he no longer engaged in that activity. Tr. 43. However, after making this

assertion, he then testified that he did go fishing with his son and grandson on one occasion since May of 2008. Tyr. 44. He did admit that he "occasionally attend[s] a concert" but that he does not go to sporting events. Id.

Gardner testified that he can (1) lift 50 pounds off the floor to table level with his left arm but cannot carry any weight with his left arm and (2) he can lift and carry "40 to 50" pounds with his right arm. Tr. 50-51. With respect to sitting and standing, Gardner's testimony was in conflict with what he reported in the "Function Report - Adult." Gardner stated that he could only sit "an hour or so" and stand 1-2 two hours. Tr. 51. Gardner testified that he could only grip things with his left hand for "a matter of a few minutes" and that he drops things with his left hand. Tr. 51-52. As for his right hand, he claimed that it was not as "severe" as the left. Tr. 52. He claimed that he recently developed a problem with his right hand. Id.

Gardner testified that he uses a cell phone; he does basic cooking; he washes dishes; he does laundry; he goes shopping; and he does house cleaning. Tr. 53. He further indicated that he watches TV and goes to the local bar and shoots pool. Id.

Gardner testified that he smokes 1 ½ packs of cigarettes per day and consumes "four to five drinks a day, alcoholic beverages." Tr. 44-45 and 55.

When asked about side-effects from medications, Gardner stated that he had none. Tr. 49.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Gardner had not engaged in substantial gainful work activity since May 14, 2008, the alleged disability onset date. Tr. 21.

At step two of the sequential evaluation process, the administrative law judge found that Gardner had the following severe impairments: "osteoarthritis of the cervical spine, history of left ulnar fracture, left carpal tunnel syndrome, bilateral hearing loss, and chronic obstructive pulmonary disease." Tr. 21. The administrative law judge found that a history of subarachnoid hemorrhage and hypertension were non-severe impairments. Tr. 22.

At step three of the sequential evaluation process the administrative law judge found that Gardner's impairments did not individually or in combination meet or equal a listed impairment. Id.

At step four of the sequential evaluation process the administrative law judge found that Gardner could not perform his

past relevant medium work as a "laborer machine operator" but had the residual functional capacity to perform a limited range of unskilled, light work. Tr. 25.  Specifically, the administrative law judge found that Gardner could perform light work that permitted him to occasionally lift 50 pounds with the left upper extremity, carry 2-3 pounds with the left upper extremity, and lift and carry 40 to 50 pounds with the right upper extremity. Gardner had no limitation in standing, walking or sitting.  He was limited to occupations that required no more than occasional crawling.  He could not climb ladders, ropes and scaffolds.  He was limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights. He was limited to only occasional reaching in all directions, including overhead work. He could not be exposed to concentrated prolonged exposure to fumes, odors, dusts, gases, chemical irritants and environments with poor ventilation.  He was limited to jobs which do not require fine bilateral hearing capability. He was limited to occupations that require no more than occasional fine fingering, gross handling, overhead reaching, feeling, pushing and pulling with the **right upper extremity** to include operation of hand levers, overhead work, and no prolonged writing or keyboard work; he cannot perform any of these last functions (fine fingering, etc.) with the left upper extremity.  Finally, he

was limited to jobs requiring no more than simple, routine task, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes. Tr. 23.

In setting this residual functional capacity, the administrative law judge found that Gardner's medically determinable impairments could reasonably be expected to cause his alleged symptoms but that Gardner's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform a limited range of light work. Tr. 24. Furthermore, the ALJ relied on the opinions of Dr. Nielsen and Dr. Ryczak. Tr. 25.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled, light work as described above and the testimony of a vocational expert found that Gardner had the ability to perform unskilled, light work as a usher, counter clerk and flagger, and that there were a significant number of such jobs in the local and national economies. Tr. 26-27.

The administrative record in this case is 302 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing

Gardner's vocational history and medical records in her decision. Tr. 19-27. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant. Gardner argues that the administrative law judge erred by (1) failing to identify all of Gardner's medically determinable impairments, (2) failing to address all the medical evidence and opinions contained in the record, (3) failing to consider Gardner's long work history in determining his credibility, and (4) finding that Gardner's receipt of unemployment compensation benefits indicates an ability to work. We find no merit in Gardner's arguments.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). No treating or examining physician has indicated that Gardner suffers from physical functional limitations that would preclude him from engaging in the limited range of light work set by the administrative law judge in hers decision for the

requisite statutory 12 month period.[19]   No physician indicated
that Gardner was incapable of working at that modest level on a
full-time basis.  Moreover, we cannot conclude based on a review
of the bare medical records that Gardner is unable to engage in
the limited range of work set by the administrative law judge (in
fact it is not our scope of review to do so in so far as we are
limited to a substantial evidence review).

        The administrative law judge relied on the opinions of
Dr. Nielsen, a state agency physician who examined Gardner, and
the opinion of Dr. Ryczak who reviewed Gardner's medical records.
The administrative law judge's reliance on those opinions was
appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d.
356, 362 (3d Cir. 2011)("Having found that the [state agency
physician's] report was properly considered by the ALJ, we readily
conclude that the ALJ's decision was supported by substantial
evidence[.]").

        Although the ALJ did not address some items of evidence,
we are satisfied that the ALJ appropriately addressed Gardner's
medical conditions and treatment for those conditions in her

_____

19.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

decision.  The Court of Appeals for this circuit has held that an ALJ is not required to discuss each and every item of evidence. See Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001).

Gardner  argues that the administrative law judge's step two analysis is defective because she did not identify and find certain conditions as medically determinable impairments. Specifically, Gardner points to conditions identified in the MRI of Gardner's cervical spine, e.g., cervical radiculopathy.  The problem with this argument is that the ALJ considered in her decisions the EMG that identified chronic radiculopathy as well as accounted for that condition and Gardner's left upper extremity weakness in the residual functional capacity assessment. Moreover, when the ALJ asked Gardner at the administrative hearing what conditions he suffered from he primarily focused on left upper extremity weakness. See Rutherford v. Barnhart, 399 F.3d 546 (3d Cir. 2005)(determining that remand was not appropriate where the claimant did not raise an impairment before the ALJ even when asked by the ALJ directly to describe her impairments).

As for Gardner's claim that the ALJ did not address his work history, the transcript of the administrative hearing reveals that the ALJ was well-aware of Gardner's lengthy work history. Tr. 60-62.  Moreover, the ALJ addressed Gardner's past relevant work in her decision. Tr. 25.  In this case Gardner did not quit his

job because of a medical condition, he was terminated by his employer and after being so terminated he initiated a job search and an application for unemployment compensation benefits which draws into question his credibility.

The administrative law judge stated that Gardner's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work. The administrative law judge was not required to accept Gardner's claims regarding his physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and

heard Gardner testify, the administrative law judge is the one best suited to assess the credibility of Gardner.

Finally, we addressed Gardner's argument regarding the ALJ's consideration of Gardner's receipt of unemployment compensation in footnote 18 and will comment no further on that argument.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

Dated: March 25, 2013